## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**DEREK SINCERE BLACK WOLF CRYER,**

      **Plaintiff,**

    **v.**                           **C.A. No. 05-11289-RCL**

**KATHLEEN M. DENNEHY, et al.,**

      **Defendants.**

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

      Defendants, Kathleen M. Dennehy, Michael Thompson, Carol Mici, Gregory McCann, Mae Robinson, Tina Ranno, Gregory Poladian, Thomas Lavelle and William Taylor, through counsel, hereby submit this memorandum of law in support of their Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

      Plaintiff Derek sincere Black Wolf Cryer ("Plaintiff") is an inmate within the custody of the Massachusetts Department of Correction ("DOC"), presently housed at MCI-Shirley, a medium security prison located in Shirley, Massachusetts.  Named as defendants are Kathleen M. Dennehy, Commissioner of Correction; Michael Thompson, MCI-Shirley Superintendent; Carol Mici, formerly MCI-Shirley Deputy Superintendent; Gregory McCann, MCI-Shirley Director of Treatment; Mae Robinson, formerly MCI-Shirley disciplinary officer; MCI-Shirley correction officers Tina Ranno and William Taylor; Gregory Poladian, formerly MCI-Shirley disciplinary officer; and Thomas Lavelle, MCI-Shirley recreation officer ("Defendants").

      Plaintiff has brought his complaint under the United States Constitution and federal statutes, 42 U.S.C. § 2000bb, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §

1983 and 42 U.S.C. § 1966, American Indian Religious Freedom Act, as well as the Massachusetts Constitution and state statutes, M.G.L. c. 93, § 102, M.G.L. c. 12, § 11I, and M.G.L. c. 266, § 127B. Plaintiff's complaint alleges violations of his right to the free exercise of religion, including: 1) defendants changed the weekday hours that plaintiff and other inmate members of the Native American Spiritual Awareness Council ("NASAC") had access to the "Native American" room and footlocker located in MCI-Shirley's programs building, limiting their access to the room for spiritual practices to the evening hours (Complaint, ¶¶ 17-20, 25, 51); 2) Native American books and videos were moved from the Native American room to the prison library; 3) on January 10, 2005 plaintiff was not permitted to enter Native American room to perform "sacred drumming ceremony" (Complaint, ¶ 39); 4) plaintiff is denied access to tobacco for religious practices (Complaint, ¶¶ 58, 82); 5) plaintiff is not permitted to purchase "sacred Native crafts" (Complaint, ¶ 58); 6) plaintiff is not permitted to purchase a four row chocker (Complaint, ¶ 58); 7) plaintiff is not permitted to consume "buffalo jerky" during Solstices and Equinox's (Complaint, ¶ 58); 8) plaintiff is not permitted to engage in spiritual practices in an outside worship area (Complaint, ¶ 58); 9) plaintiff is not permitted to engage in sweat lodge, "Pow Wow" or "Giveaway" ceremonies (Complaint, ¶¶ 58, 82); 10) plaintiff is not permitted to purchase a personal prayer pipe (Complaint, ¶ 82). Plaintiff also alleges that defendants Robinson, Poladian and Ranno subjected him to harassment, retaliation and discrimination (Complaint, ¶¶ 16, 21, 32, 46, 55). The complaint should be dismissed for failure to state a claim upon which relief can be granted.

## ARGUMENT

**I.     PLAINTIFF HAS FAILED TO EXHAUST AVAILABLE ADMINISTRATIVE REMEDIES REGARDING HIS FREE EXERCISE OF RELIGION CLAIMS.**

Plaintiff's federal claims pertaining to his free exercise of religion must be dismissed

for failure to exhaust all available administrative remedies as required under the Prison

Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e)a.[1]  Exhaustion of administrative

remedies is a requirement, or condition precedent, under the PLRA which must be met before

a prisoner's federal cause of action can accrue.  In *Porter v. Nussle*, 534 U.S. 516, 532

(2002), the Supreme Court held that the "PLRA's exhaustion requirement applies to all

inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." The *Porter* Court

held that:

> [e]ven when the prisoner seeks relief not available in grievance proceedings,
> notably money damages, exhaustion is a prerequisite to suit.  And unlike the
> previous provision, which encompassed only § 1983 suits, exhaustion is now
> required for all 'action[s] . . . brought with respect to prison conditions,'
> whether under § 1983 'or any other Federal law.'

*Porter*, 534 U.S. at 524. The First Circuit, in *Casanova v. DuBois*, 289 F.3d. 142, 147 (1st

Cir. 2002), held that while the PLRA's exhaustion requirement is not jurisdictional, "the

exhaustion requirement is nonetheless mandatory."  *See Perez v. Wisconsin Department of*

*Corrections*, 182 F.3d 532, 537 (7th Cir. 1999) ("a suit filed by a prisoner before

administrative remedies have been exhausted must be dismissed"); *Jackson v. District of*

*Columbia*, 254 F.3d 262, 270 (D.C. Cir. 2001) (PLRA's language requires exhaustion prior

to commencing prisoner lawsuit); *Curry v. Scott*, 249 F.3d 493, 501 n.2 (6th Cir. 2001);

*Alexander v. Hawk*, 159 F.3d 1321, 1325-26 (11th Cir. 1998); *Garrett v. Hawk*, 127 F.3d

1263, 1265 (10th Cir. 1997). *See also Ryan v. Pepe*, __ Mass. App. Ct. __, 2006 Mass. App.

---

[1]    42 U.S.C. § 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

LEXIS 356 (March 31, 2006) (PLRA's exhaustion requirement is mandatory and requires that "[b]efore proceeding in court, the record must affirmatively demonstrate that the plaintiff inmate has pursued to final resolution any available administrative remedy or procedure that might redress his claim or issue.").

The fact that the administrative remedy available does not include the relief sought by the plaintiff does not allow an inmate to avoid the exhaustion requirement. The text of § 1997e(a) makes exhaustion mandatory without regard to the efficacy of the remedies at issue. The courts have specifically held that there is no futility exception under the PLRA. The Supreme Court, in *Booth v. Churner*, 532 U.S. 731, 739 (2001), addressed a prisoner's claim that he was exempt from the PLRA's exhaustion requirement where the remedy available under the prison's administrative procedures did not provide the monetary relief he sought. In rejecting the prisoner's narrow interpretation of the PLRA's exhaustion requirement, the Supreme Court held that where the available administrative process has the authority to provide some relief or take some action in response to a prisoner's complaint, even though it did not provide the specific remedy sought by the inmate, the administrative process is "available" and must be exhausted. *Booth*, 532 U.S. at 736-739 ("one 'exhausts' processes, not forms of relief, and the statute provides that one must"). The *Booth* Court looked at the statutory history of § 1997e(a) and determined that through the 1995 amendments to § 1997e(a), "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures," *Booth*, 532 U.S. at 741. In particular, the *Booth* Court determined that the 1995 amendment to § 1997e(a) eliminated the "requirement that the administrative procedures must satisfy certain 'minimum acceptable standards' of fairness and effectiveness before inmates can be required to exhaust them and the court's discretion to excuse exhaustion when it would not be 'appropriate

and in the interests of justice.'" *Booth*, 532 U.S. at 739 n.5.  *See Nyhuis v. Reno*, 204 F.3d 65, (3rd Cir. 2000) (elimination of the words "plain, speed, and effective" from § 1997e(a) precludes application of a futility exception and the word "available" refers to any remedy the prison supplies, rather than one of the prisoner's choosing"); *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999); *Tafoya v. Simmons*, 116 F.3d 489 (10th Cir. 1997) (no futility exception where Congress has specifically mandated exhaustion). *See also Frazier v. Fairhaven School Committee*, 276 F.3d 52, 61-62 (1st Cir. 2002) (discussion of Supreme Court's decision in *Booth v. Churner, supra.* in context of IDEA exhaustion requirement).

Recently, the United State Supreme Court made clear that the PLRA's exhaustion requirement demands that the prisoner's exhaustion of prison administrative remedies must be proper. *Woodford v. Ngo*, __ U.S. __, 126 S. Ct. 2378 (2006).  The *Woodford* Court overturned the Ninth Circuit's reversal of a district court decision finding that the prisoner's failure to meet the time restrictions for filing a grievance warranted the dismissal of the complaint for failing to properly exhaust the state's grievance procedures.  In finding that the PLRA's exhaustion requirement necessitates that a prisoner fully comply with the procedures of the administrative remedy, the *Woodford* Court stated:

> Construing § 1997e(a) to require proper exhaustion also fits with the general scheme of the PLRA, whereas respondent's interpretation would turn that provision into a largely useless appendage.  The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' (citations omitted).  The PLRA also was intended to 'reduce the quantity and improved the quality of prisoner suits.' (citation omitted).  Requiring proper exhaustion serves all of these goals.  It gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisoners with a fair opportunity to correct their own errors.  This is particularly important in relation to state corrections systems because it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with

state laws, regulations, and procedures, than the administration of its prisons. (citation omitted). … While requiring proper exhaustion serves the purposes of the PLRA, respondent's interpretation of § 1997e(a) would make the PLRA exhaustion scheme wholly ineffective. The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction, and under respondent's interpretation of the PLRA noncompliance carries no significant sanction.

*Woodford,* 126 U.S. at 2387- 2388.

Moreover, to the extent that a prisoner has exhausted available administrative remedies for some, but not all claims raised in the complaint, the complaint should be dismissed in its entirety pursuant to § 1997e (a). *See Bey v. Johnson*, 407 F.3d 801, 806-808 (6th Cir. 2005) (holding that total exhaustion is required under PLRA); *Ross v. Bernalillo*, 365 F.3d 1181, 1188-89 (10th Cir. 2004) (PLRA requires total exhaustion in cases where complaint alleges both exhausted and unexhausted claims); *Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000) (dismissing complaint where "at least some of plaintiff's many claims were not fully exhausted"); *Pridgett v. Correctional Medical Services*, 02-CV-11700-MEL (D. Mass. Oct. 18, 2005) (memorandum and order allowing defendants' motion to dismiss) (copy of the unpublished decision is attached).[2]

In addition to its Inmate Grievances policy, 103 CMR 491.00 (2001) *et seq*., the DOC has developed a separate administrative review procedure for the consideration of inmate requests regarding religious practices and property through the Religious Services Review Committee ("RSRC"). In 1999, the DOC, in an effort to process and fairly accommodate the multitude of religious practices and property requests by inmates, established the Religious Services

---

[2]   To date, the First Circuit has not addressed the issue as to whether the PLRA requires total exhaustion of a prisoner's claims prior to filing a complaint.

Handbook. The Religious Services Requests section of the Religious Services Handbook and the Inmate Property Policy, 103 CMR 403.00 *et seq.* set out the procedures that must be utilized by inmates when seeking review of requests for religious property or practices that are not authorized in the Religious Services Handbook. *See* 103 CMR 403.10(9).[3] The administrative review process for inmate religious services requests requires an inmate to complete an Inmate Religious Request Form to be submitted to the prison's Superintendent or designee for review and recommendation. Next, the inmate religious request is reviewed by the RSRC, a board consisting of senior Department officials, including the Associate Deputy Commissioners and the Director of Program Services. *Id.* The RSRC then makes a recommendation to the Commissioner for a final decision on the inmate religious request. *Id.*

The Massachusetts Supreme Judicial Court, in *Rasheed v. Commissioner of Correction*, 446 Mass. 463, 476-477 (2006), determined that the DOC's RSRC review process, as set out in the Religious Services Handbook and 103 CMR 403.10(9), constitutes a valid administrative remedy for the review of inmate religious services requests. The *Rasheed* Court stated:

> Pursuant to his authority, the commissioner promulgated 103 Code Mass. Regs. § 403.10(9) establishing departmental guidelines with respect to religious articles, and 103 Code Mass. Regs. §§ 471.00 (1998), establishing religious programs and services. In addition, consistent with his broad authority, the commissioner prepared and established the handbook to serve as a tool and reference source for prison administrators and inmates. The handbook provides a process by which inmates can make specific requests

---

[3]    103 CMR 403.10 (9), entitled Religious Articles, states:

A list of approved religious articles will be posted quarterly in the inmate libraries. If an inmate has a request for an item that is not on the list of approved religious articles, the inmate should submit his or her request to the Superintendent. The Superintendent will forward the request with a recommendation to the Religious Services Review Committee through the Director of Program Services for review. The Religious Services Review Committee consists of the three Assistant Deputy Commissioners, the Director of Offender Management and Placement and the Director of Program Services. This committee shall meet on an as needed basis to review requests for religious articles that are not already approved for retention and shall forward their recommendations to the Commissioner for his approval.

> through a religious services review committee (committee), consisting of
> several senior correction officials who review the requests for potential
> security concerns and make recommendations to the commissioner for a
> final determination. … By developing the handbook, the commissioner not
> only provided guidelines for prison officials but also provided a mechanism
> for inmates to seek an exception, striking the balance between an inmate's
> needs and an institution's objectives specifically permitted by G.L. c. 127, §
> 88.  In the absence of any evidence that the handbook, as applied to
> Rasheed, violates any applicable statute or constitutional provision, it is
> valid and in accord with relevant statutory and regulatory authority.

*Rasheed*, 446 Mass. at 476-477.

Accordingly, the RSRC administrative review procedures for inmate requests for religious practices and property items meet the definition of an available administrative process under 42 U.S.C. § 1997e(a) where the RSRC administrative process is designed to take action in response to inmate religious requests.  *See Booth, supra*.  As made clear by the *Booth* Court, the plain language and statutory history of 42 U.S.C. § 1997e(a) do not place restrictions on the type of administrative process and relief that prisons may make available to inmates to redress their complaints regarding conditions of confinement.

In the instant case, plaintiff did not properly exhaust the RSRC administrative procedures regarding the religious practices and property issues raised in his federal compliant, prior to filing the complaint.  Plaintiff did file numerous grievances regarding some of the issues raised in his complaint, most frequently regarding his allegations of staff misconduct and harassment. However, he was advised that he needed to raise issues pertaining to religious practices and property with the RSRC.  *See* Complaint, Exhibit F.  While plaintiff did complete several Inmate Religious Services Request Forms regarding many of the religious practices and property issues raised in the instant complaint, *see* Complaint, Exhibit XX, he failed to follow the proper administrative procedures.  Plaintiff improperly sent his Inmate Religious Services Request forms directly to Allison Hallett, DOC Director of Program Services, instead of giving them to

the prison's Director of Treatment as the Superintendent's designee. On August 5, 2004 plaintiff's original Inmate Religious Services Request forms were returned to him and plaintiff was advised that the RSRC procedures required him to submit the Inmate Religious Services Request forms directly with the MCI-Shirley Director of Treatment. *See* Complaint, Exhibit YY. Despite the clear instructions of the August 5, 2004 letter, plaintiff failed to submit the forms to the Director of Treatment. *See* Affidavit of Allison Hallett, ¶¶ 3-6 (attached as Exhibit 1).[4]

While plaintiff did make a single request to the RSRC seeking recognition of his "African American Indian religion," which properly followed the RSRC procedures, plaintiff failed to properly comply with the RSRC review procedures with regard to the issues raised in his complaint, including: 1) additional access to the prison's Native American room and religious property locker; 2) return of Native American books from MCI-Shirley's general library to the Native American spiritual room; 3) plaintiff denied access to the Native American room to perform "sacred drumming ceremony" on January 10, 2005; 4) access to tobacco for religious practices; 5) access to "sacred Native crafts;" 6) access to a four row chocker; 7) access to "buffalo jerky" during Solistices and Equinox; 8) access to an outside worship area at MCI-Shirley; 9) plaintiff not permitted to engage in sweat lodge, "Pow Wow" or "Giveaway" ceremonies; and 10) plaintiff not permitted to purchase a personal prayer pipe.

Therefore, in light of plaintiff's failure to exhaust his available administrative remedies on all his claims *prior* to filing his complaint, the complaint should be dismissed in its entirety. *See* 42 U.S.C. § 1997e(a); *Bey, supra; Ross, supra; Porter, supra; Woodford*, *supra*.[5] [6]

---

[4]  Defendants have submitted the Hallett Affidavit for review to the extent this Court finds that it is the defendants' burden to demonstrate plaintiff's failure to properly exhaust available administrative remedies.

[5]   Plaintiff's claim under the federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb must be dismissed where the Supreme Court has determined RFRA to be unconstitutional as applied to States. *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). *See also Williams v. Secretary for the Department of Corrections*, 113 Fed. Appx. 682, 2005 WL 1130351 (11th Cir. 2005).

## II.    PLAINTIFF IS UNABLE TO STATE A CLAIM FOR RETALIATION OR HARASSMENT UNDER 42 U.S.C. § 1983.

Plaintiff's complaint alleges in conclusory fashion that defendants Robinson, Poladian and Ranno engaged in harassing and retaliatory behavior against him.    Specifically, plaintiff alleges that on numerous occasions, these defendants denied him access to the Native American room and footlocker during weekday mornings and afternoons.    *See e.g.,* Complaint, ¶¶ 14-17 & Exhibits A-D.

While correctional officials may not discipline inmates for an improper purpose, *Sires v. Berman*, 834 F.2d 9, 13-14 (1st Cir. 1987), courts impose stringent standards for prisoners' claims of retaliation for the exercise of grievances or litigation.    First, courts recognize that "deference is due prison administrators in their attempts to secure the safety of prison staff, and to preserve discipline in the prisons." *Sires v. Berman, id*. at 14, *citing Bell v. Wolfish*, 441 U.S. at 547-48. Accordingly, to set forth a claim of retaliation, a prisoner must be able to demonstrate that the alleged improper decision would not have been made "but for" the impermissible purpose of retaliation.    *Layne v. Vinzant*, 657 F.2d 468, 475 (1st Cir. 1981).    In *Scarpa v. Ponte*, 638 F. Supp. 1019, 1029 (D. Mass. 1986), the court held that even if defendants had an impermissible reason for disciplining the prisoner, they would still not be liable if they also had independent, permissible reasons for doing so.    Plaintiff has the "substantial burden" of proving that "but for" retaliation he would not have been subjected to the challenged conduct.    *Jackson v. Fair*, 846 F.2d 811, 820 (1st Cir. 1988).    To succeed on this claim, plaintiff must also show that the

---

[6]    Plaintiff's claim under the American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C. § 1966, must be dismissed where it is well established that "AIRFA is merely a statement of federal policy to protect Indians' exercise of their religion; it confers no cause of action." *Lockhart v. Kenops*, 927 F.2d 1028, 1036 (8th Cir. 1991) (*citing Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988)).  *See also Standing Deer v. Carlson*, 831 F.2d 1525, 1530 (9th Cir. 1987); *Wilson v. Block*, 708 F.2d 735, 746-747 (D.C. Cir 1983) (AIRFA sets out federal policy requiring federal agencies to avoid unnecessary interference with traditional Indian religious practices); *Attakai v. United States*, 746 F. Supp. 1395, 1404-1405 (D. Ariz. 1990) (AIRFA is a statement of policy and "does not create a cause of action in federal courts for violations of religious freedoms.").

retaliatory conduct violated his constitutional rights under § 1983. *See Cochran v. Morris*, 73 F.3d 1310, 1318 (4th Cir. 1996).

Courts have also recognized that a retaliation charge carries a substantial potential for abuse. Without close judicial scrutiny, any prisoner who has ever grieved a complaint or filed a lawsuit would be able to cry retaliation whenever correctional officials took any action not to his liking:

> Every act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct. The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.

*Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994), *cert. denied* 514 U.S. 1022 (1995).

A state defendant cannot be held liable in his supervisory capacity for the alleged civil rights violations since the liability of a public employer or supervising official for civil rights violations cannot be predicated on a theory of *respondeat superior*. *See Polk County v. Dodson*, 454 U.S. 312, 326 (1981); *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).

Nor does verbal harassment or the use of derogatory language in a prison rise to the level of a constitutional violation. "It is settled that emotional damage by verbal harassment does not amount to infringement of a constitutional right, and thus is not actionable under Section 1983." *Shabazz v. Cole*, 69 F. Supp. 2d 177, 199 (D. Mass. 1999); *Barney v. Pulsipher*, 143 F.3d 1299, 1310 n. 11 (10th Cir. 1998) ("acts of verbal harassment are not sufficient to state a claim under the Eighth Amendment"); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D. N.Y. 1998) ("verbal harassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally

protected right" under section 1983); *Partee v. Cook County Sheriff's Office*, 863 F. Supp. 778, 781 (N.D. Ill. 1994).

Here, it is clear that plaintiff is unable to state a claim for retaliation or harassment on the part of the defendants.  First, plaintiff has failed to present any facts which demonstrate that the named defendants engaged in any retaliatory actions.  Defendant does not alleged that he received a disciplinary report or any adverse administrative action in response to his filing of grievances or the instant civil action.  Second, plaintiff's allegation that the named correctional staff failed to provide him with access to the Native American room and footlocker at his request does not evidence retaliatory or harassing conduct.  It is quite apparent from the complaint and attached exhibits that plaintiff was upset at the decision of prison administrators to reduce the hours of inmate weekday access to religious programs in the MCI-Shirley programs building, including the Native American room and footlocker.  *See* Complaint Exhibits. N, P, S   The fact that correctional staff refused to provide plaintiff with additional access to the Native American room and footlocker on weekday mornings and afternoons due to the change in scheduling does not evidence retaliatory or harassing conduct.  At most, the complained of behavior of some defendants was the result of their miscommunications regarding the hours of inmate access to the Native American room and footlocker.  Plaintiff has failed to meet his burden of demonstrating that "but for" the purpose of retaliation on the part of the defendants, he would have been provided additional access to the Native American room and footlocker.  In the absence of facts demonstrating that plaintiff was the recipient of retaliatory or harassing action on the part of any the defendants, this claim should be dismissed.

### III.    PLAINTIFF IS UNABLE TO DEMONSTRATE A CONSPIRACY UNDER §1983.

In a conspiracy claim under § 1983, a "plaintiff must allege and prove both a conspiracy and an actual deprivation of rights." *Landrigan v. City of Warwick*, 628 F.2d 736 (1st Cir. 1980); *Trafford v. Penno*, 800 F. Supp. 1052, 1057 (D. R.I. 1992). An agreement between conspirators as to a common purpose is the principle element of a conspiracy claim. *Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir. 1988).  Allegations of conspiracy will not serve to impose liability for the underlying wrong on persons whose only involvement is in the cover-up, but not in the planning or execution of the alleged underlying wrongful act. *Landrigan, supra* at 742.

Plaintiff alleges in conclusory fashion that defendants McCann, Robinson, Ranno and Poladian conspired to violate his civil rights.  Plaintiff's claim of a conspiracy between these defendants must be dismissed where he fails to present any facts which demonstrate an agreement between the defendants to violate his rights or an actual deprivation of his civil rights.

### IV.    COURT SHOULD DECLINE TO EXERCISE PENDANT JURISDICTION OVER STATE LAW CLAIMS IN ABSENCE OF A VIABLE FEDERAL CLAIM.

To state a civil rights claim under 42 U.S.C. § 1983, a plaintiff must allege that a defendant, acting under color of state law, engaged in conduct which deprived him of a right, privilege, or immunity secured by the Constitution of the United States.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Johnson v. Summers*, 411 Mass. 82, 86 (1991).  This statute, 42 U.S.C. § 1983, in and of itself does not offer plaintiff any substantive ground for relief.   It is well established that § 1983 is not a source of substantive rights, but merely provides a method for vindicating *federal* rights conferred under the United States Constitution.  *Chapman v. Houston Welfare Rights, Org.*, 441 U.S. 600, 615-618 (1978); *Aponte-Torres v. University of Puerto Rico*, 445 F.3d 50, 55 (1st Cir. 2006) ("A plaintiff seeking to recover under section 1983 must allege what is colloquially known as 'constitutional injury,' that is he or she must identify a deprivation of

some federally secured right."); *Rio Grande Community Health Center v. Rullan*, 397 F.3d 56, 72-73 (1st Cir. 2005) ("Not all violations of federal law give rise to § 1983 actions: "[the] plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*.") *(citing Blessing v. Firestone*, 520 U.S. 329, 340 (1997)) (emphasis in original).

Rights that arise only from state law are not enforceable by § 1983. Since § 1983 requires violation of a federal constitutional right, the mere failure to properly follow state law or regulations cannot provide the basis for a § 1983 claim. *See Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984); *Coyne v. City of Somerville*, 972 F.2d 440, 444 (1st Cir. 1992) ("It is bedrock law in this circuit, . . . that violations of state law -- even where arbitrary, capricious, or undertaken in bad faith -- do not, without more, give rise to a denial of substantive due process under the U.S. Constitution"); *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995) ("It is established beyond peradventure that a state actor's failure to observe a duty imposed by state law, standing alone, is not a sufficient foundation on which to erect a section 1983 claim.").

The power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one "substantial" federal claim in the lawsuit. *See United Mine Workers v. Gibb*, 383 U.S. 715, 725 (1966); *Newman v. Burgin*, 930 F. 2d. 955, 964 (1st Cir. 1991) ("When a district court dismisses all federal claims before trial, it normally will dismiss pendent state actions as well. … Since 'pendant' claims, by definition, consist of state matters over which Congress did *not* grant federal courts independent jurisdiction, it is not surprising that federal courts hesitate to hear them when stripped of their federal support prior to any helpful, related or legal determination, they stand before the court both pristine and alone."). A district court has considerable authority whether or not to exercise this power, in light of such

considerations as judicial economy, convenience, fairness to litigants, and comity. *See Carnegie-Melon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *Vera-Lozano v. International Broadcasting*, 50 F.3d 67, 70 (1st Cir. 1995) (28 U.S.C. § 1367 provides that a district court may refuse to exercise this [supplemental] jurisdiction if the state claim "substantially predominates over the claim or claims over which the district court has original jurisdiction" or "the claim raises a novel or complex issue of state law.").

In the case at bar, plaintiff is unable to show that defendants violated any federal right. In particular, plaintiff has failed to exhaust his federal claims with regard to his free exercise of religion. Also, plaintiff is unable to state a claim under 42 U.S.C. § 1983 with regard to the alleged retaliatory and harassing conduct of some of the named defendants. In the absence of any federal right violations, this Court should decline to accept jurisdiction over the state law claims and dismiss the complaint.

## CONCLUSION

For the foregoing reasons, defendants request that the complaint be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: November 17, 2006                                    Respectfully submitted,

                                                            NANCY ANKERS WHITE
                                                            Special Assistant Attorney General


                                                            /s/ Richard C. McFarland
                                                            Richard C. McFarland,   BBO# 542278
                                                            Legal Division
                                                            Department of Correction
                                                            70 Franklin Street, Suite 600
                                                            Boston, MA 02110-1300
                                                            (617) 727-3300

**CERTIFICATE OF SERVICE**

I, Richard C. McFarland, counsel for Defendants, hereby certify that on this 17th day of November, 2006, I served copies of Defendants' Motion to Dismiss and the Memorandum of Law in Support of Defendants' Motion to Dismiss upon *pro se* plaintiff, Derek Sincere Black Wolf Cryer, by first class mail, postage prepaid, to his address: MCI-Shirley, Harvard Rd., P. O. Box 1218, Shirley, MA  01464.

/s/ Richard C. McFarland
Richard C. McFarland

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTWYAN PRIDGETT,<br>　　　Plaintiff,<br><br>　　　　　v.<br><br>CORRECTIONAL MEDICAL SERVICES,<br>et al.,<br>　　　Defendants. | )<br>)<br>)<br>)<br>)　　02-CV-11700-MEL<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM AND ORDER

LASKER, D. J.

　　　Plaintiff Antwyan Pridgett ("Pridgett"), an inmate incarcerated at MCI-Cedar Junction, brings a *pro se* civil rights action pursuant to 42 U.S.C. §§ 1981, 1983, 1985, 1986; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134; § 504 of the Rehabilitation Act, 29 U.S.C. §§ 701 - 794; 28 U.S.C. §§ 1332-1334; M.G.L. c. 12 §§ 11H and 11I; M.G.L. c. 93A; the state and federal constitutions; and Department of Corrections ("DOC") regulations.  Named as individual defendants are DOC employees Sherry Elliott, Director of Treatment for MCI-Cedar Junction; Steven Toomey, MCI-Cedar Junction Director of Food Services; Beverly Vegias, MCI-Cedar Junction Librarian; Richard Salomon, MCI-Cedar Junction Recreational Officer; James Parlon, former MCI-Cedar Junction Lieutenant; Michael Thompson, former DOC Director of Offender Management; and Timothy Hall,

1

Acting Assistant Deputy Commissioner.

Pridgett alleges that the defendants violated his civil rights by: (1) failing to provide him with a diet that meets the requirements of his Rastafarian religion; (2) serving him spoiled food; (3) denying him access to legal materials and photocopies of documents; (4) confiscating his crutches; and (5) inadequately treating his Osgood-Schlatter's disease.[1]  Pridgett seeks declaratory and injunctive relief and damages.

The defendants move to dismiss the Complaint on multiple grounds.

## I. Exhaustion of Administrative Remedies

The defendants argue that the Complaint should be dismissed because Pridgett failed to exhaust administrative remedies, as required under the Prison Legal Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), and M.G.L. c. 127 § 38F.  Pridgett maintains that he did exhaust all administrative remedies, and points to numerous grievance reports filed with the DOC's

---

[1] Osgood-Schaltter's disease is a condition caused by repetitive stress or tension, and characterized by microfractures of the tibia, as well as inflammation of the patellar tendon and surrounding tissues.  It is a disorder of the early teens, particularly during growth spurts, and is more likely to affect young men than young women, and more likely to affect athletes involved in running and/or jumping.  It is a transient, short-term disorder that usually requires only rest and restraint from further strenuous activity, for a relatively short period of time, in order to heal itself.  (National Institutes of Health, Department of Health and Human Services, National Institute of Arthritis and Musculoskeletal and Skin Disease, http://www.niams.nih.gov/hi/topics/kneeprobs/kneeqa.htm.)

Religious Services Review Committee ("RSRC"), as well as requests to staff members, regarding his allegedly inadequate diet.

The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002). The fact that the administrative remedy available does not include the relief sought by the prisoner does not allow him to avoid the exhaustion requirement. Where the established administrative process can provide some relief or respond with some action to remedy a prisoner's complaint, that administrative process is considered available and must be exhausted. <u>Booth v. Churner</u>, 532 U.S. 731 (2001).

Pridgett has offered evidence, in the form of xerox copies of original documents, that he filed numerous grievances and requests regarding his diet. For example, on December 27, 2000, Pridgett submitted an "Inmate Request to Staff Member" requesting double portions of bread and vegetables; on February 26, 2001, he submitted an "Inmate Religious Services Request Form" requesting he be placed on a "Rastafarian vegetarian diet"; on March 18, 2001, he submitted a "Special Diet Request Form" to receive a "Kosher/Vegetarian" diet which, in accordance with his Rastafarian religion, would be free of all meat, meat product,

3

and dairy product; and on March 9 and April 10, 2001 he submitted
two "Inmate Religious Services Request Forms", the first
requesting to be placed on the "alternative/vegetarian diet", and
the second further specifying that his diet must contain "non-
dairy products."  Another "Inmate Request to Staff Member" dated
April 15, 2001 reveals that Pridgett was advised to fill out
additional forms to be submitted to the Religion Review
Committee, which has sole authority to place inmates on a diet
without meat or dairy products.  Again on June 4, 2001, an
"Inmate Request to Staff Member" shows that Pridgett was advised
to complete further paperwork so that his request could be
evaluated by the Religion Review Committee.

The communications directing Pridgett to submit
additional paperwork in support of his diet requests were made by
Director of Treatment Sherry Elliott, who has not submitted any
affidavit in this case.  However, the affidavit of Ann Marie
Aucoin, the individual responsible for administration of the
inmate grievance system and keeper of inmate grievance records at
MCI-CJ, attests to the filing of three total grievances from
2001-2002, regarding problems with a toilet, with a razor, and
with a staff member.  According to the Aucoin affidavit, during
this time period Pridgett did not file any grievance regarding
the quality of food served to him, his need for a vegetarian diet
free of all dairy products, the confiscation of his crutches, or

4

access to legal materials. Aucoin further states that in 2003, Pridgett filed one grievance regarding his being served spoiled vegetables. Similarly, the sworn affidavit of Allison Hallett, who oversees all religious programming at MCI-CJ, states that Pridgett did not make a single request to RSRC regarding his need for a vegetarian diet free of all dairy products.

However, even if Pridgett did exhaust all administrative remedies with respect to his dietary requests, which is by no means demonstrated by the record, there is no indication that Pridgett exhausted his administrative remedies for the other claims contained in his Complaint. To the extent that a plaintiff-prisoner has exhausted some, but not all, the claims raised in the Complaint, the Complaint should be dismissed in its entirety pursuant to 42 U.S.C. § 1997e(a). See Bey v. Johnson, 407 F.3d 801, 806-08 (6th Cir. 2005)(holding that total exhaustion is required under PLRA); Ross v. County of Bernalillo, 365 F.3d 1181, 1190 (10th Cir. 2004)(finding PLRA requires total exhaustion in cases involving mixed complaints alleging both exhausted and unexhausted claims); Graves v. Norris, 218 F.3d 884, 885 (8th Cir. 2000)(dismissing complaint where "at least some of the plaintiff's many claims were not fully exhausted"). Accordingly, Pridgett's failure to exhaust administrative remedies with respect to each of his claims warrants dismissal of the entire action.

## II. Free Exercise of Religion

Pridgett cannot demonstrate that the vegetarian alternative diet violates his First Amendment right to free exercise of religion.  While it is well established that prisoners do not lose all constitutional protections upon their incarceration, the free exercise right is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional objectives such as deterrence of crime, prisoner rehabilitation, or institutional security.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49 (1987).  Even assuming that Pridgett could demonstrate that the vegetarian alternative diet substantially burdens his exercise of the Rastafarian religion, "[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987).

Four factors are examined to evaluate whether a regulation is reasonably related to legitimate penological interests: (1) there must be a "valid rational connection between the prison regulation and the legitimate government interest put forward to justify it"; (2) courts must consider whether there are "alternative means of exercising the right that remain open to prisoner inmates"; (3) courts must determine the "impact accommodation of the asserted constitutional right on guards and

6

other inmates, and on the allocation of prison resources generally"; and (4) courts must ascertain whether there are "ready alternatives" to the regulation.  Id. at 89.

In the instant case, a vegetarian diet that meets national dietary requirements for inmates whose religious beliefs eschew meat is reasonable given the DOC's financial, security, and health concerns.  The DOC has a legitimate interest in providing cost effective and efficient food service by keeping meal options both simple and nutritious.  Moreover, the vegetarian diet does not deprive Pridgett of all forms of religious exercise.  He is still able to possess religious materials, to engage in prayer, and to undertake other expressions of his faith.  Additionally, allowing Pridgett to eat an individualized diet could have a negative financial and administrative impact, and could create security concerns based on a perception among inmates that others are receiving preferential treatment.  Finally, it appears that there are no reasonable available alternative diets which would accommodate Pridgett's demands, given the complexity of the Rastafarian religion's restrictions.  As such, Pridgett's free exercise claims are dismissed.

### III. Cruel and Unusual Punishment

Pridgett has not stated a cognizable claim of cruel and unusual punishment, because he has not alleged that the

7

conditions of his confinement - including the removal of his
crutches and the serving of spoiled vegetables - constitute a
serious deprivation of basic needs in contravention of
contemporary standards of decency. Farmer v. Brennan, 511 U.S.
825, 837 (1994); Hudson v. McMillan, 503 U.S. 1, 9 (1992); Wilson
v. Seiter, 501 U.S. 294, 298-300 (1991); Rhodes v. Chapman, 452
U.S. 337, 347 (1981). Pridgett has also failed to allege that
prison officials acted with the necessary state of mind, namely
deliberate indifference to the conditions of his confinement.
Wilson, 501 U.S. at 299-300; Farmer, 511 U.S. at 837.

The Eighth Amendment mandates that prison officials
provide humane conditions of confinement, including adequate
food, clothing, shelter, and medical care. Farmer, 511 U.S. at
832. However, even if Pridgett was served spoiled vegetables on
several occasions, and even if his crutches were removed after
the medical order authorizing their use had expired, these
allegations do not rise to the level of an Eighth Amendment
violation. Such actions were not punishment meted out in
contravention of the "minimal civilized measure of life's
necessities," and are not extreme deprivations involving the
"unnecessary and wanton infliction of pain contrary to
contemporary standards of decency." Rhodes, 452 U.S. at 347;
Wilson, 501 U.S. at 300; Estelle v. Gamble, 429 U.S. 97, 103
(1976). Accordingly, the Eight Amendment claims are dismissed.

*IV. Access to the Courts*

_____Pridgett asserts that he was unable to timely obtain legal materials and photocopying services, and that his access to the courts was thereby impeded.  To state a claim of denial of access to the courts, an inmate must make a *prima facie* showing of a resulting injury or prejudice.  Lewis v. Casey, 518 U.S. 343 (1996); Sowell v. Vose 941 F.2d 32, 34-35 (1st Cir. 1991). Moreover, because Pridgett's claim involves "ancillary features" rather than a systematic denial of all legal materials or legal assistance, Pridgett is required to demonstrate that the deprivation led to an actual injury.  Sowell, 941 F.2d at 34.

One possible source of injury to Pridgett was the delay he encountered in receiving the necessary documents.  However, the record reveals that Pridgett moved for numerous extensions of time in order to file motion papers and supporting memoranda, and the Court repeatedly granted these motions.  Thus, Pridgett sustained no actual, meaningful injury, and his access to the courts was not impeded.  Accordingly, his claim for denial of access to the courts is dismissed.

*V. Qualified Immunity*

The motion to dismiss is also properly granted on the grounds that the individual defendants are entitled to qualified immunity, and therefore cannot be held liable under 42 U.S.C. § 1983. The Supreme Court has held that "officials can act without

9

fear of harassing litigation only if they reasonably can anticipate where their conduct may give rise to liability for damages". <u>Davis v. Scheuer</u>, 468 U.S. 183, 195 (1984). Therefore, an individual can be held liable in his official capacity only if a right is established with sufficient particularity, such "that a reasonable official would understand that what he is doing violates that right." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). The DOC defendants did not violate clearly established law with regard to the vegetarian diet served to Pridgett or his access to the court, and they are therefore entitled to qualified immunity.

## VI. *Americans with Disabilities Act and Rehabilitation Act*

In order to state a claim under Title II of the ADA, a plaintiff must demonstrate that: (1) he is a qualified individual with a disability, defined as a major physical or mental impairment that substantially limits a major life activity; (2) he was excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. <u>Parker v. Universidad de Puerto Rico</u>, 225 F.3d 1, 5 (1st Cir. 2000). Similarly, a threshold question in determining whether an individual is entitled to protection under the Rehabilitation Act is whether that person is handicapped. For the purposes of the

10

Rehabilitation Act, "handicapped" is defined as: (1) having a physical or mental disability that substantial limits a major life activity; (2) having a record of such impairment; or (3) being regarded as having such an impairment. 29 U.S.C. § 706(8).

The Complaint does not allege that Osgood-Schlatter's disease affects Pridgett's ability to function, nor does it point to any other purported handicaps. As such, Pridgett cannot show that he suffers from an impairment that substantially limits a major life activity, or that he was excluded from participation in or denied the benefits of DOC services, programs, or activities because of a disability. Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002). Accordingly, his claims under the ADA and Rehabilitation Act are dismissed.

## VII. Massachusetts Law

Pridgett cannot state a claim for damages under the Massachusetts Constitution. The Massachusetts Appeals Court has held that there is no authority to base a damages claim directly upon the Commonwealth's Declaration of Rights absent a statute providing for specific enforcement of the rights asserted. Martino v. Hogan, 37 Mass. App. Ct. 710, 720-21 (1994).

Pridgett's claim under the Massachusetts Civil Rights Act also fails, because Pridgett has not alleged that the defendants interfered with his civil rights through threats, intimidation, or coercion. Bell v. Mazza, 394 Mass. 176, 178

11

(1985).

*VIII. Department of Corrections Regulations*

DOC regulations do not create a private right of action, and therefore Pridgett lacks standing to seek declaratory, injunctive, or monetary relief. The relevant enabling statutes nowhere mention the possibility of a private action in equity or a private damages action. See <u>Loffredo v. Center for Addictive Behaviors</u>, 426 Mass. 541, 546-47 (1998). In related contexts, Massachusetts courts have found it improbable that the legislature, in granting a state agency the authority to promulgate regulations, also intended to empower the agency with the ability to create potential civil liability. See <u>Martino</u>, 37 Mass. App. Ct. at 720-21. Finally, policy considerations contradict the view that any administrative regulation confers a private right for damages. Were that the case, agencies might be discouraged from promulgating standards for fear of endless litigation.

*            *            *

Accordingly, the defendants' motion to dismiss the Complaint is granted.

It is so ordered.


Dated:     October 18, 2005
           Boston, Massachusetts        /s/ Morris E. Lasker
                                             U.S.D.J.

EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DEREK SINCERE BLACK WOLF CRYER,

     Plaintiff,

    v.                             C.A. No. 05-11289-RCL

KATHLEEN M. DENNEHY, et al.,

     Defendants.

### AFFIDAVIT OF ALLISON HALLETT

I, Allison Hallett, depose and hereby state the following:

    1.    I am the Director of Program Services for the Department of Correction. I have held this position since June, 2002. My duties include oversight of all institutional rehabilitative, recreational and religious programming for inmates. Prior to that, I served as Deputy Director of the Community Corrections Unit for the Department of Correction from March 1, 1998 until June 26, 2002. I have been employed with the Department of Correction since February 16, 1988. The information provided herein is based on my personal knowledge.

    2.    The Department of Correction houses approximately 10,000 inmates at seventeen (17) institutions. These institutions range from maximum to pre-release security level facilities. Each facility is charged with the task of allocating time and space for the various types of programs, including accommodations of various religious activities.

    3.    In order to process and fairly accommodate the multitude of practices and religious property item requests by inmates, the Department of Correction developed a Religious Services Handbook in 1999 as a reference tool to assist administrators when evaluating inmate religious requests. A copy of the Religious Services Handbook ("RSH") is available to all

**EXHIBIT**

_1_

2

inmates in the inmate law library. The Handbook sets out the process an inmate must follow in order to be granted permission to acquire a religious item not presently allowed by the Department or to follow a practice that may conflict with DOC policies, procedures or practices. An inmate may indicate his request regarding a religious services issue on the Inmate Religious Services Request Form, and along with supporting documentation, submit it to the Superintendent of an institution or his designee, and the Superintendent will forward the information, along with his or her recommendation, to the Religious Services Review Committee, ("RSRC").

4.      The RSRC will review the request and make a formal recommendation to the Commissioner. The RSRC may seek further information regarding the request from a variety of sources, including the Department's chaplains, and outside religious groups. 103 CMR 403.10(9).      The RSRC is comprised of the Associate Commissioner for Reentry and Reintegration, two Assistant Deputy Commissioners who represent the Department of Correction's penultimate security concerns and myself, who functions as chairperson of the committee. 103 CMR 403.10(9).

5.      I have reviewed the RSRC files regarding inmate requests for religious services made by MCI-Shirley inmate Derek Cryer. My review of RSRC records indicates that the RSRC has received a religious services request from inmate Cryer regarding a request that the DOC recognize his African American Indian religion and provide him with worship times that were separate and apart from the worship times for Native American spiritual practices available to MCI-Shirley inmates on a daily basis. Inmate Cryer's RSRC request pertaining to the recognition of the African American Indian religion was reviewed the MCI-Shirley Superintendent on September 2, 2005, who recommended that the request be denied based on

3

security concerns. The RSRC next reviewed inmate Cryer's request and in its November 16, 2005 report to the Commissioner, recommended that the request be denied. Commissioner Dennehy subsequently approved the RSRC recommendation regarding inmate Cryer's request. Inmate Cryer received notice of the Commissioner's denial of his RSRC request for recognition of the African American Indian religion on December 27, 2005. It should be noted that inmate Cryer re-filed the same RSRC request on November 29, 2005. See Attachment A.

6.    In particular, the RSRC records show that the committee has not received written requests from inmate Cryer seeking such religious services and property as: 1) additional access to the prison's Native American room and religious property locker from 9:00 a.m. to 11:00 a.m. and from 1:00 p.m. to 9:00 p.m. every day; 2) access to an outside worship area at MCI-Shirley; 3) access to morning and afternoon smudging and prayer pipe ceremonies; 4) access to ceremonial tobacco for religious practices; 5) access to "authenticated Native Indian spiritual items from authenticated Native sources;" 6) a four row chocker; 7) "buffalo jerky" during "Native sacred holy days;" 8) access to a personal prayer pipe; 9) access to "Native arts and crafts;" 10) return of Native American books from MCI-Shirley's general library to the Native American spiritual room; and 11) access to "Native clergy" through one on one visits, telephone calls and mail.

Signed under the pains and penalties of perjury this _1st_ day of November, 2006.


Allison Hallett
Director of Program Services

**Inmate Religious Services Request Form**

1. What is the official name of the faith group? Native American Spiritual Awareness Council

2. Who is the head of the faith group? Volunteers Paul Pouliot & Denise Mahigan

3. What is the address and telephone number of the faith group in Massachusetts or the U.S.?
COWASUCK BAND - PENNACOOK / ABENAKI PEOPLE, COWASS North America, Inc., P.O. Box 554, Franklin, MA, 02038
(800) 556 - 1301 or ✱ Fax (508) 528-7874
(508) 528 - 7629

4. Does the faith group have ministers or teachers?    Yes ✓    No_____

5. Are the ministers available to visit incarcerated members of the faith group?
Yes ✓    No_____

6. Are there religious holy days to be observed?    Yes ✓    No_____

7. If so, what religious practices are necessary for the observance? Smudging, Praying, Singing & drum playing etc. Things Already established.

8. Are there time and space requirements for the faith? If so, please explain? Yes. 1½ hours to Pray (Worship) in Mornings, afternoons and evenings. Enough Space to Form A Circle For practitioners to Sit about.

9. Is the religion open to all inmates?    Yes ✓    No_____

10. Please provide reference material, which would be useful for researching this group? This group is Already established here at Shirley Medium.

11. What is your specific request? I'm requesting Permission to be Allowed Equal Access to the Already existing Native Worship Area on Thursdays, Fridays, and Saturdays to practice African American Indian Religion, to that given to the European American Indians. I Am a Blackfoot-Mahican African American Indian, And these times requested are open to ALL inmates of every nationality.

Name: Derek M. Cryer _____    Commitment Number: W-55424

**Attachment: G**                                   Page 1 of 2

:C: Michael Thompson, Superintendent
Kathleen Dennehy, Commissioner
Spiritual Leaders / Advisors
File / 7-27-05

ATTACHMENT A

# Religious Services Request Form

Institution:___MCI-Shirley_____     Date of Request::___7/27/05_____

Inmate Name:__Derek Cryer_____     Commit Number:___W-55424_____

Request (Be specific: What was requested? When does inmate want it? Where does inmate want to utilize it?):___Inmate requesting separate Native American Group referred to as African American Native religion.

Religion:___Native American (African)_____

Please attach inmate's completed Religious Request Questionnaire Form.

Institution recommendation: Approve _____ Deny __x__

If recommendation is to deny, please give the following information:

1.  Clearly articulate the security reason(s) for this recommendation (Be specific): Segregating religions based on race will negatively affect inmate/institution climate. It is also noted that African American Native Religion is not recognized by DOC and inmate has provided no independent documentation regarding such a religion.

2.  What alternatives were asked for or could be offered? Inmate has been advised he is free to participate in Native American Group.

3.  Was anyone contacted outside of the institution concerning this request? If so, who? No

_____     _____
Signature of Superintendent                Date  9/8/05

Please send completed forms to the Religious Services Review Committee

Attachment G                                    Page 2 of 2

[Stamp: RECEIVED SEP 1 2 2005  RSR 01-0368]





*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*

*Department of Correction*
*Program Services Division*

*P. O. Box 351*
*Framingham, MA  01704*
*(508) 620-6437, Fax (508) 620-7099*

**Mitt Romney**
*Governor*
**Kerry Healey**
*Lieutenant Governor*
**Edward A. Flynn**
*Secretary*

**Kathleen M. Dennehy**
*Commissioner*
**James R. Bender**
*Deputy Commissioner*

RECEIVED
NOV 18 2005
DEPARTMENT OF CORRECTION
COMMISSIONER'S OFFICE

TO:   Kathleen M. Dennehy, Commissioner

FR:   Alison E. Hallett, Director of Program Services

DA:   November 16, 2005

RE:   Religious Services Handbook

The Religious Services Review Committee convened a meeting on September 13, 2005 to discuss institutional and inmate requests. The Religious Services Review Committee consists of Veronica Madden, Associate Commissioner, Reentry and Reintegration; Timothy Hall, Assistant Deputy Commissioner, Southern Sector; John Marshall, Assistant Deputy Commissioner, Northern Sector and myself. The Religious Services Review Committee reviewed several inmate requests and made the following recommendations:

*The RSRC reviewed 14 requests from NCCI for Sage, Juniper, Copal, and Osha Root:*

➢   Inmate ████████████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied.  Inmate ██████ can access approved herbs during Native American corporate worship services.

➢   Inmate ████████████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied.  Inmate ██████ can access approved herbs during Native American corporate worship services.

➢   Inmate ████████████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied.  Inmate ██████ can access approved herbs during Native American corporate worship services.

➢   Inmate ████████████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied.  Inmate ██████ can access approved herbs during Native American corporate worship services.

➢   Inmate ████████████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied.  Inmate ██████ can access approved herbs during Native American corporate worship services.

➢ Inmate ██████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate ████ can access approved herbs during Native American corporate worship services.

➢ Inmate ██████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate ██ can access approved herbs during Native American corporate worship services.

➢ Inmate ████████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate ████ can access approved herbs during Native American corporate worship services.

➢ Inmate ██████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate ████ can access approved herbs during Native American corporate worship services.

➢ Inmate ██████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate ███ can access approved herbs during Native American corporate worship services.

➢ Inmate ██████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate ███ can access approved herbs during Native American corporate worship services.

➢ Inmate ██████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate ████ can access approved herbs during Native American corporate worship services.

➢ Inmate D██████ request from North Central Correctional Center for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate N████ can access approved herbs during Native American corporate worship services.

➢ Inmate R██████ request from North Central Correctional Center for tobacco for ceremonial use be denied. Per 103 DOC 444.01 Inmate Smoking, "the smoking, possession or other use of tobacco products by inmates is prohibited on all Department of Correction property, and property under the control of the department". Inmate ████ can access kinnick kinnick. Inmate ██████ request for sage, juniper, copal, and osha root for ceremonial use be denied. Inmate ██████ may continue to access approved herbs during Native American corporate worship services.

➢ Inmate R██████ request from Old Colony Correctional Center for recognition of his faith, African Spiritual Science Temple, be deferred. Inmate ██████ must submit official documentation to substantiate the existence of this religion and the required religious diet, as well as what religious property is needed to practice the religion.

➢ Inmate ██████ request from Bay State Correctional Center for Native American Prayer feather for in cell and on person use be denied. Inmate ██████ may access feather for corporate worship only as approved in the Religious Services Handbook.

➤ Inmate ███████ request from Bay State Correctional Center for Native American Prayer feather for in cell and on person use be denied. Inmate ████ may access feather for corporate worship only as approved in the Religious Services Handbook.

➤ Inmate ███████ request from Old Colony Correctional Center to purchase religious oils from unauthorized vendors be denied. Inmate ███████ can purchase approved oils as outlined in the Religious Services Handbook.

➤ Inmate ███████ request from Souza Baranowski Correctional Center for recognition of his faith, United Church of God, and permission to a vegetarian diet be denied. Inmate ████ can practice in cell as a sole practitioner.  Inmate ████ may request a pork free diet.

➤ Inmate ███████ requests from MCI Cedar Junction for recognition of his faith, Asatru, the ability to purchase and wear the Hammer of Thor medallion and purchase runes was partially denied. Inmate ████ can practice the Asatru faith in cell as a sole practitioner.  Inmate ███████ request to purchase runes for in-cell use is approved however his request to purchase and wear the Hammer of Thor medallion is denied, this medallion is a security threat group symbol.

➤ Inmate ███████ request from Souza Baranowski Correctional Center to purchase audio and videotapes from unauthorized vendors be denied. Audio and videotapes are not considered corporate worship items.

➤ Inmate Derek Cryer's request from MCI Shirley for recognition of his faith, African American Native religion, be denied.  The Department of Correction does not segregate religions based on race.

➤ Inmate ███████ request from Northeastern Correctional Center to be transported to another facility on a monthly basis to participate in a sweat lodge ceremony was deferred for a feasibility study by the institution for a sweat lodge at the institution.

➤ Inmate ███████ request from Bay State Correctional Center for written approval listing the on person and in cell religious items for Native Americans be denied. Inmate ███████ can access the approved on person/in cell religious item list for Native American's housed at medium security facilities in the Religious Services Handbook, available in the Inmate Library.

➤ Inmate ███████ request from Bay State Correctional Center for sage for ceremonial use be approved as outlined in the Religious Services Handbook.  In the Religious Services Handbook, sage is approved as part of the smudging refill kit.

➤ Inmate ███████ request from Old Colony Correctional Center to celebrate 12-13 Wiccan Esbats in addition to the 8 Sabbats already approved for corporate worship Wiccan holiday observances be approved.  Documentation submitted by inmate ███████ clearly demonstrates that there is an Esbat every time there is a full moon.  Research conducted by the Program Services Division indicates that there are 13 Esbat's per year based on the thirteen moons.  If requested inmate should be allowed to consume cake and juice for the Esbat's as they are allowed to do for Sabbat's.

If you have any questions or need further information please let me know.  Should you approve of the above recommendations, notifications will be made accordingly.

Approved:

_____     11-01-05
Kathleen M. Dennehy, Commissioner                    Date


Denied:

_____     _____
Kathleen M. Dennehy, Commissioner                    Date

# Inmate Religious Services Request Form

1. What is the official name of the faith group? Native American Spiritual Awareness Council.

2. Who is the head of the faith group? Volunteers Paul Pouliot/Denise Mehigan

3. What is the address and telephone number of the faith group in Massachusetts or the U.S.?
   COWASUCK BAND-PENNACOOK/ABENAKI PEOPLE, COWASS North America,Inc,
   P.O. Box 554, Franklin, MA. 02038

   ( 800 ) 556 - 1301 OR (508) 528-7629
        Fax (508) 528-7874

4. Does the faith group have ministers or teachers?    Yes X    No

5. Are the ministers available to visit incarcerated members of the faith group?
   Yes X    No

6. Are there religious holy days to be observed?    Yes X    No

7. If so, what religious practices are necessary for the observance? Smudging, Praying,
   Singing, Dancing, Drum Playing etc. Things already established.

8. Are there time and space requirements for the faith? If so, please explain? Yes. 1-1/2 hours
   to Pray (worship) in Mornings, Afternoons, and Evenings. Enough
   Space to form a circle for practitioners to sit about.

9. Is the religion open to all inmates?    Yes X    No

10. Please provide reference material, which would be useful for researching this group?Black India
    -A Hidden Heritage, by William Loren Katz (book) AND Black Indians: A
    American Story, Narrated by James Earl Jones (VHS).

11. What is your specific request? To be allowed Equal Access to the existing
    Native Indian Worship Area in the Programs Building to practice
    Black Indian Spirituality ("religion") on Thursdays, Fridays, and
    Saturdays.

Name: Derek M. Cryer        Commitment Number: W-55424
      Derek M. Cryer

**Attachment: G**                              W-55424
CC: Native Spiritual Leaders/Advisors         **Page 1 of 2**
    Michael Thompson, Superintendent
    file/November 29, 2005



*The Commonwealth of Massachusetts*
*Executive Office of Public Safety*

*Department of Correction*
**MCI-Shirley**

**P. O. Box 1218**
**Shirley, Massachusetts 01464**
**(978) 425-4341, Fax (978) 514-6601**
*www.mass.gov/doc*



**Mitt Romney**
*Governor*
**Kerry Healey**
*Lieutenant Governor*
**Edward A. Flynn**
*Secretary*

**Kathleen Dennehy**
*Commissioner*
**James Bender**
*Deputy Commissioner*
**Michael A. Thompson**
*Superintendent*

December 27, 2005

Derek Cryer W-55424
MCI-Shirley / C-2
P.O. Box 1218
Shirley, MA  01464

Dear Mr. Cryer:

Please be advised that Commissioner Dennehy has denied your request for recognition of African American Native Religion.

The Department of Correction does not segregate religions based on race.

I trust this response addresses your concerns.

Sincerely,

Greg McCann
Director of Treatment

GM/emc

cc:  Michael A. Thompson Superintendent
     file

*"Accredited by the Commission on Accreditation for Corrections"*